**In the Interest of E.H. III, H.H., S.H., R.H., and J.H., Minor Children, E.H. II, Father, Appellant.**

No. 97–55.

Supreme Court of Iowa.

May 28, 1998.

D. Bradley Kiesey, Washington, for appellant.

Thomas J. Miller, Attorney General, and Gordon E. Allen, Deputy Attorney General, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, ANDREASEN, and TERNUS, JJ.

TERNUS, Justice.

The juvenile court, in this child-in-need-of-assistance case, entered a dispositional order that the father have no contact with his minor children. This order was based on a finding that the father had physically and sexually abused his daughter, Sarah. The father appealed, claiming (1) the juvenile court erred in denying his request to have his daughter and son called as witnesses or interviewed by a person of the father's choice, (2) the juvenile court erred in refusing to admit a report of a polygraph test administered to the son, (3) the record lacked clear and convincing evidence of physical or sexual abuse by the father, and (4) the order requiring the father to complete a sexual offender treatment program violated his Fifth Amendment right against self-incrimination.

The court of appeals remanded the case to the juvenile court to receive further evidence and to reconsider its finding of physical and sexual abuse. On further review, we vacate the court of appeals' decision and affirm the judgment of the juvenile court.

I. *Background Facts and Proceedings.*

Earl II and Geri have five children who were adjudicated children in need of assistance (CINA) in June 1995. *See* Iowa Code § 232.96 (1995). The primary grounds for

this adjudication were (1) the school-age children were not attending school nor being home schooled, (2) the eldest child, Earl III, had sexually abused his younger sister, Sarah, for several years, (3) there were episodes of domestic violence by Earl II against his wife, and (4) a disabled daughter, Heather, had not been provided needed medical care. Pursuant to the initial dispositional order, Earl III and Heather were placed in the custody of the Department of Human Services (DHS), and the other children remained in their parents' care subject to certain conditions, including counseling and schooling. *See id.* § 232.99.

In October 1995, the children were temporarily removed from their father's custody because Earl II was interfering with the children's therapy. *See id.* § 232.103. Two months later, the State applied for a no-contact order against the father based on new allegations by Sarah that her father had physically and sexually abused her.

At the hearing on the State's application, the juvenile court admitted two videotaped interviews of Sarah into evidence, one concerning the abuse by Earl III and a later tape concerning her abuse by Earl II. Earl II objected to admission of the tapes and requested an order allowing him to cross-examine Sarah and Earl III or to have the children interviewed by a person of his choice. The juvenile court denied this motion and also denied the father's request to admit a report of a polygraph test given to Earl III concerning Earl III's sexual abuse of his sister.

Stating Sarah's allegations of abuse were "very convincing," the juvenile court found Earl II had physically and sexually abused Sarah. The court entered a no-contact order and required Earl II to attend a sexual offender treatment program and to obtain a recommendation from a therapist before he would be allowed to see his children and return home.

Earl II appealed, claiming the errors previously noted. The appeal was transferred to the court of appeals who reversed the juvenile court's no-contact order and remanded the case to give the father an opportunity to have his daughter reinterviewed. The case now comes to us on the State's application for further review of the court of appeals' decision.

## II. ·Denial of Father's Application to Call Children as Witnesses or to Reinterview Children.

Earl II argued in defense to the sexual abuse allegations that Sarah attributed instances of abuse by Earl III to her father out of spite toward him. He· also claimed that DHS and the children's therapists disliked him and somehow planted the idea of physical and sexual abuse in Sarah's mind. In an application filed prior to the hearing on the State's application for a no-contact order, the father requested permission to call Sarah and Earl III as witnesses at the hearing. In the alternative, Earl II wanted the children interviewed again by a person of the father's choice or by a person not employed by or related to Tanager Place (where the children were receiving therapy) or DHS. Earl II also objected to the introduction of the videotaped interviews of Sarah on the basis that (1) they were hearsay, and (2) their admission without Sarah's in-person testimony deprived him of his Sixth Amendment right to confrontation.

The juvenile court denied the application, finding that Sarah and Earl III would be unduly traumatized by testifying in court and such an event would interfere with their therapy. The court also concluded another interview, especially by a stranger, would also interfere with their therapy, and that additional interviews would serve no useful purpose. Finally, the court rejected the father's hearsay and Sixth Amendment claims.

We review the father's constitutional claim de novo. *See State v. Veal,* 564 N.W.2d 797, 806 (Iowa 1997) (reviewing claimed violation of Confrontation Clause of the Sixth Amendment de novo). To the extent the father's claim of error rests on statutory interpretation, our review is for correction of errors of law. *See State v. Terry,* 569 N.W.2d 364, 366 (Iowa 1997). Otherwise, we generally review evidentiary rulings for abuse of discretion. *See Veal,* 564 N.W.2d at 803; *State v. Weaver,* 554 N.W.2d 240, 247 (Iowa 1996); *cf. In*

*re Long,* 313 N.W.2d 473, 482 (Iowa 1981) (holding juvenile court did not abuse its discretion in admitting expert testimony). We find an abuse of discretion where a decision is clearly unreasonable, "is not based on substantial evidence . . ., or is based on an erroneous application of the law." *City of Windsor Heights v. Spanos,* 572 N.W.2d 591, 592 (Iowa 1997).

■ A. *Hearsay.* On appeal, Earl II claims the second videotaped interview of his daughter is inadmissible hearsay. Iowa Code section 232.96(6) provides for the admission of reports containing hearsay under certain circumstances:

> A report, study, record, or other writing or an audiotape or videotape recording made by the department of human services, a juvenile court officer, a peace officer or a hospital relating to a child in a [CINA] proceeding . . . *is admissible notwithstanding any objection to hearsay statements contained in it provided it is relevant and material and provided its probative value substantially outweighs the danger of unfair prejudice to the child's parent,* guardian, or custodian. The circumstances of the making of the report, study, record or other writing or an audiotape or videotape recording, including the maker's lack of personal knowledge, may be proved to affect its weight.

(Emphasis added.) The record shows the challenged interview of Sarah was conducted at a Cedar Rapids hospital by a hospital-employed interviewer who held a master's degree in social work. The subject of the interviews was Sarah's allegations of physical and sexual abuse by her father, making the videotape "relevant and material" to the hearing. We think the juvenile court reasonably concluded the probative value of the tapes substantially outweighed any danger of unfair prejudice to the father. The interviewer's questions were open-ended and non-leading; Sarah answered the questions in an assured and confident manner. Moreover, the father was afforded ample opportunity at the hearing to undermine Sarah's credibility with other evidence. We find no abuse of discretion in the juvenile court's ruling that

Earl II's hearsay objection was without merit.

■ B. *Sixth Amendment right of confrontation.* The father claims that admission of Sarah's videotaped interview combined with the refusal of his request to call Sarah as a witness operated to deny the father his Sixth Amendment right of confrontation. *See* U.S. Const. amend. VI. We have previously held that the Sixth Amendment Confrontation Clause does not apply to civil CINA proceedings. *See In re L.K.S.,* 451 N.W.2d 819, 822 (Iowa 1990). Thus, this allegation of error must be rejected.

■ C. *Request to call the children as witnesses or to reinterview the children.* The mother, the guardian ad litem for the children, and the therapists treating the children agreed that requiring Earl III and Sarah to testify at the hearing would traumatize them and interfere with their therapy. Earl III, in particular, had expressed a fear of testifying because he did not want to "take sides." We find no abuse of discretion in the juvenile court's conclusion that the best interests of the children militated against their testimony in court.

■ We also find no abuse of discretion in the juvenile court's decision that another interview was not warranted under the circumstances presented. The record shows that an interview of the children by a stranger, requesting that they detail the events of sexual abuse, would be inappropriate and a setback in their recovery. Earl III's therapist testified that another interview requiring Earl III to reiterate the sexual abuse he inflicted on his sister could trigger resentment, causing him to reoffend. Moreover, additional interviews would serve no useful purpose. The abusive events involving Sarah and Earl III are well documented in the record before us. When Sarah was questioned about her father's abuse in the second videotaped interview, she was able to clearly distinguish events concerning her father from those involving her brother. Given the damage to the children's therapy that would occur from additional interviews and the cumulative character of the evidence sought,

the juvenile court did not abuse its discretion in denying the father's application.[1]

### III. Admission of Polygraph Report.

In his effort to document the sexual abuse of Sarah by her brother, Earl II sought to introduce into evidence a polygraph report of an interview of Earl III concerning Earl III's abuse of Sarah. The polygraph report was not offered for the opinion of the polygraph examiner; rather, the father merely wanted to introduce into evidence the statements made by Earl III to the examiner. The trial court held that the evidence was inadmissible because the report was "the result of a polygraph examination."

■■■ We have said the "results" of a polygraph examination are inadmissible because the reliability of such examinations has not been adequately demonstrated. *See State v. Losee*, 354 N.W.2d 239, 242 (Iowa 1984); *In re Fairbanks*, 287 N.W.2d 579, 582 (Iowa 1980); *State v. Freeland*, 255 Iowa 1334, 1338–39, 125 N.W.2d 825, 827–28 (1964). The "results" to which we have referred are the opinions of the examiner as to which questions were answered truthfully. Because "the scientific acceptance and evidentiary reliability" of the process by which an examiner determines whether the person being tested has answered truthfully has not been established, the examiner's testimony is inadmissible opinion. evidence. *See State v. Conner*, 241 N.W.2d 447, 459 (Iowa 1976). Where both parties stipulate to the admission of polygraph evidence, however, it may be admitted. *See State v. McNamara*, 252 Iowa 19, 29, 104 N.W.2d 568, 574 (1960).

Notwithstanding the inadmissibility of the examiner's opinions, we have affirmed the admission of statements made by a defendant during an interview preceding the actual polygraph examination over an objection that the statements were not voluntary. *See State v. Payton*, 481 N.W.2d 325, 328 (Iowa 1992). We have also upheld, in a civil case, the admission of statements made during the examination. *See Johnson v. Civil Serv.*

*Comm'n*, 352 N.W.2d 252, 256 (Iowa 1984). In *Johnson*, a police officer challenged his termination of employment in the district court. *Id.* at 254. At trial, the court permitted a polygraph examiner to testify to certain statements made by the terminated employee during a polygraph examination required as a condition of continued employment. *Id.* at 255. On appeal to this court, the employee argued the statements should have been excluded because (1) they violated his Fifth Amendment right against self-incrimination, and (2) the use of his admissions was fundamentally unfair and a violation of due process. *Id.* at 255–56. We rejected both claims and considered the employee's statements in our de novo review. *Id.* at 256.

■■■ As a review of these cases demonstrates, statements made during a polygraph examination, as opposed to the opinion of the polygraph examiner, have never been ruled per se inadmissible by our court. Thus, we think the juvenile court's rationale for excluding the statements made by Earl III during the polygraph examination—that polygraph evidence in general is inadmissible—is imprecise and overly broad. The admissibility of such evidence depends on the type of polygraph evidence offered and the specific objection lodged against its admission.

Notwithstanding our disapproval of the juvenile court's reason for excluding this evidence, we may affirm its ruling on any ground apparent from the record. *See State v. Jones*, 490 N.W.2d 787, 790–91 (Iowa 1992); *Newmire v. Maxwell*, 161 N.W.2d 74, 80 (Iowa 1968). Therefore, we turn now to the objections made by the State at the time Earl II sought to introduce the polygraph report.

■■■ The State objected to the admission of Earl III's statements as irrelevant and cumulative. The State continues to argue on appeal that the evidence the father sought to introduce through the polygraph report was already before the court. We agree. The

---

1. The court of appeals discussed the due process implications of the father's request that Sarah be reinterviewed. *See* U.S. Const. amend V. We find no mention of a Fifth Amendment due pro-

cess claim in the trial court proceedings or in the appellant's brief. Therefore, we do not discuss it.

sexual abuse perpetrated on Sarah by her brother was fully documented in the record and the statements made by Earl III to the polygraph examiner would have been cumulative. On this basis, we find no abuse of discretion in the juvenile court's decision to exclude the polygraph evidence. *See Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997) (holding no abuse of discretion in trial court's exclusion of evidence where evidence was cumulative); *State v. Harrington*, 349 N.W.2d 758, 761–62 (Iowa 1984) (same).

### IV. *Findings of Physical and Sexual Abuse.*

The father challenges the juvenile court's finding that he physically and sexually abused his daughter. He claims there is not clear and convincing evidence to support such a finding. *See* Iowa Code § 232.96(2) ("The state shall have the burden of proving the allegations by clear and convincing evidence.").

We review CINA cases de novo. *See In re A.M.H.*, 516 N.W.2d 867, 870 (Iowa 1994). Although this court is not bound by the juvenile court's factual findings, we give them weight, especially on issues concerning the credibility of witnesses. *See id.* Our overriding consideration is the best interest of the children. *See* Iowa Code § 232.1.

A. *Physical abuse.* The allegation of physical abuse centered on Earl II's administration of water enemas to Sarah. He claimed they were used for medical purposes; Sarah claimed they were given to her as punishment. Sarah's version of these events was corroborated by her mother and brother. Both Geri and Earl III said Sarah complained to them shortly after she was given the enemas, saying that they hurt and that her father was punishing her. The record also shows Geri confronted Earl II after Sarah told her what had happened; Earl II confirmed that he had given the enemas to Sarah as discipline. Earl III also asked his father what he had done; Earl II told his son "Sarah got an enema for punishment." Earl II's belated attempt to justify his actions is not believable.

B. *Sexual abuse.* The juvenile court found that Earl II had sexually abused Sarah on several different occasions as detailed by Sarah in her videotaped statement. He denied the abuse, contending (1) Sarah was attributing abuse by her brother to Earl II, and (2) Earl II was physically incapable of an erection. (One incident of abuse consisted of Earl II's exposure of his erect penis to Sarah to teach her about sex, and then masturbating to the point of ejaculation in Sarah's presence.)

We have reviewed the videotapes and find Sarah's description of these events to be credible. During her second interview, Sarah was comfortable, confident and able to respond to questions. The questions themselves were not leading or suggestive. Sarah remembered the details of the events involving her father, as well as where other family members were when the abuse occurred. She was able to distinguish between the incidents with her father and those with her brother.

Earl II introduced testimony from his physician that he suffered from several medical conditions for which he took medication. Earl II's doctor testified that the combination of these conditions and the medication would probably render Earl II impotent, although the physician had not performed any tests to determine Earl II's sexual functioning.[2] This testimony does not eliminate the possibility that the event described by Sarah could occur. Again, the resolution of this issue depends on the relative credibility of Sarah and her father.

We have previously judged Sarah to be a credible witness. We have not witnessed Earl II's testimony and so must rely on the juvenile court's observations. The juvenile court did not find Earl II's testimony con-

2. Earl II also introduced a report from the University of Iowa Urology Clinic in which he is reported to have complained of having no erections in the last four to five years. We place no weight on this report as it was based on a history given by Earl II in March of 1996, subsequent to the court's ex parte no-contact order of October 27, 1995, in which the allegations of sexual abuse by Earl II first surfaced.

vincing. We give weight to this conclusion in assessing the evidence before us.

The father also attacks Sarah's credibility by alleging her therapists and DHS employees poisoned her mind against him and sanctioned her lies about him. The only evidence in the record that this occurred was the testimony of Sarah's grandmother, Earl II's mother. This witness testified Sarah related that the caseworker from Tanager Place told Sarah what to say about her father and that if she did not say it, Sarah would be placed in foster care. The juvenile court found this testimony unbelievable and so do we. The court noted that the caseworker's testimony and demeanor were completely professional and totally consistent with what one would expect from a treatment therapist—observations totally at odds with the grandmother's allegations of unprofessional conduct. We will again rely on the juvenile court's assessment of the credibility of these witnesses in weighing the evidence on appeal.

In summary, we find clear and convincing evidence that Earl II physically and sexually abused Sarah. We now turn to the father's challenge to the juvenile court's order that he not be allowed to see his children until a reputable sexual offender treatment therapist recommends such contact recommence.

V. *Did the Juvenile Court's Order that the Father Obtain the Recommendation of a Reputable Sexual Offender Treatment Therapist as a Condition of Contact with His Children Violate the Father's Fifth Amendment Right Against Self–Incrimination?*

 In the dispositional order from which this appeal was taken, the juvenile court stated it would "require sexual offender treatment before [Earl II] could re-enter the family home." The court made the following order concerning Earl II's contact with his children:

> [Earl II] shall have no contact whatsoever with any of his children from the date of this order until further court order. The Court will reconsider this issue upon the Court being informed that a reputable sexual offender treatment therapist recommends contact to recommence.

Earl II complains about this aspect of the court's order, claiming that it violates his Fifth Amendment right against self-incrimination. He asserts that any sexual offender treatment program will require an admission of sexual abuse. Earl II contends that in order to obtain the recommendation needed to see his children, he will have to incriminate himself.

 The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege applies not just to criminal trials, but also allows a person " 'not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409, 418 (1984) (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281 (1973)). When the State "compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment." *Lefkowitz v. Cunningham,* 431 U.S. 801, 805, 97 S.Ct. 2132, 2135, 53 L.Ed.2d 1, 7 (1977).

This latter principle has given rise to Fifth Amendment claims in the context of court-ordered therapy requiring an admission of criminal conduct. *See generally* William Wesley Patton, *The World Where Parallel Lines Converge: The Privilege Against Self–Incrimination in Concurrent Civil and Criminal Child Abuse Proceedings,* 24 Ga. L.Rev. 473 (1990); Jessica Wilen Berg, Note, *Give Me Liberty or Give Me Silence: Taking a Stand on Fifth Amendment Implications for Court–Ordered Therapy Programs,* 79 Cornell L.Rev. 700 (1994); Scott Michael Solkoff, Note, *Judicial Use Immunity and the Privilege Against Self–Incrimination in Court Mandated Therapy Programs,* 17 Nova L.Rev. 1441 (1993). Courts have viewed such situations differently. *E.g., Mace v. Amestoy,* 765 F.Supp. 847, 850–52 (D.Vt.1991) (holding defendant's Fifth Amendment rights had been violated when his probation was revoked based on his failure to complete a sexual treatment program

that required incriminating admissions); *Gyles v. State,* 901 P.2d 1143, 1148–50 (Alaska Ct.App.1995) (finding potential violation of Fifth Amendment where defendant refused to take polygraph test as part of court-ordered therapy made a condition of probation); *Gilfillen v. State,* 582 N.E.2d 821, 824 (Ind.1991) (holding trial court could not make completion of court-ordered treatment program requiring an admission of guilt a condition of probation); *In re Welfare of J.W.,* 415 N.W.2d 879, 882–84 (Minn.1987) (holding court could not require parents to divulge incriminating information, but court could consider parents' failure to undergo meaningful therapy in deciding whether parents could regain their children); *State v. Fuller,* 276 Mont. 155, 915 P.2d 809, 816 (1996) (holding state had violated the defendant's Fifth Amendment rights and consequently was prohibited from using any of the information revealed during court-ordered treatment program in later, separate criminal prosecution).

We think the case before us is quite similar to the facts presented in *State ex rel. Juvenile Department v. Black,* 101 Or.App. 626, 792 P.2d 1225 (1990). In *Black,* the court found a child to be within the state's jurisdiction because her father had sexually abused her. 792 P.2d at 1226. In a dispositional order, the court required the father to complete an incest treatment program before he could have any visitation with his daughter. *Id.* The father challenged this order, asserting he would be required, as part of a treatment program, to admit to the abuse. *Id.* (The father had maintained his innocence at all stages of the proceedings. *Id.*) He argued such an admission would violate his right against self-incrimination. *Id.*

The Oregon Court of Appeals rejected the father's claim because "the legal issues that he raise[d] [were] not ripe for review." *Id.* at 1228. The court pointed out there was no evidence that the state "required [the] father to complete a particular program that demands an admission ... or that the [state] disapproved of [the] father's participation in a particular treatment program that would satisfy his concerns." *Id.* at 1227 (emphasis omitted). In summary, the father had failed to prove that the court's order had the effect

of requiring him to incriminate himself. *Id.* at 1228.

The present case suffers from the same failure of proof. The juvenile court did not require a particular type of program, nor did it specify where Earl II should obtain treatment. Although there was some indication in the record that Tanager Place may require an admission as a condition of its treatment program, one witness testified that the program had a "back-door" approach toward counseling without an admission of sex crimes. Finally, there is no evidence in the record, other than the assertions of Earl II, that all treatment programs would require an admission of sexual abuse before recommending that Earl II be allowed contact with his children. The existence of such a universal requirement is not a matter appropriate for judicial notice. *See generally Motor Club of Iowa v. Department of Transp.,* 251 N.W.2d 510, 517 (Iowa 1977) ("To be capable of being judicially noticed a matter must be of common knowledge or capable of certain verification."). Therefore, the father's failure of proof is fatal to his constitutional claim.

In conclusion, we are unable under the record before us to conclude that Earl II's Fifth Amendment rights have been or will be violated by the court's order. Therefore, we affirm the order in all respects.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**