**IN THE COURT OF APPEALS OF IOWA**

No. 16-0125
Filed April 6, 2016

**IN THE INTEREST OF J.S. AND J.S.,**
**Minor children,**

**R.M., Mother,**
Appellant.

_____

Appeal from the Iowa District Court for Page County, Susan L. Christensen, Judge.

A mother challenges the juvenile court's adjudication of her daughter and son as children in need of assistance. **AFFIRMED.**

Vicki R. Danley, Sidney, for appellant mother.

Thomas J. Miller, Attorney General, and Janet L. Hoffman, Assistant Attorney General, for appellee State.

Justin Wyatt of Woods & Wyatt, P.L.L.C., Glenwood, for minor children.

Considered by Tabor, P.J., and Bower and McDonald, JJ.

**TABOR, Presiding Judge.**

A mother appeals the juvenile court's determination that her ten-year-old daughter J.G.S. and thirteen-year-old son J.C.S. are children in need of assistance (CINA) under Iowa Code section 232.2(6)(c)(1) (2015). The court found the State presented clear and convincing evidence J.G.S. suffered, and J.C.S. was imminently likely to suffer, harmful effects as a result of mental injury caused by acts of their mother, Rachel. The mother raises due process, prior bad acts, and sufficiency challenges to the juvenile court's rulings. After reviewing the record anew, we reject the mother's constitutional and evidentiary claims and find ample support for the juvenile court's adjudication and dispositional orders.

## I. Facts and Prior Proceedings

Rachel and Matthew are the divorced parents of J.C.S. and J.G.S.[1] Matthew is not the biological father of J.G.S., but adopted her in 2008. After a modification action in 2014, the district court granted Matthew sole legal custody and physical care of both children. While the modification action was on appeal, Rachel set up a first-time meeting between J.G.S. and her biological father, without notice to the girl's therapist or Matthew. In January 2015, a troubled J.G.S. told her therapist she wanted to go live with her biological father.

In February 2015, J.G.S. stayed with Rachel while the Iowa Department of Human Services (DHS) investigated an allegation that Matthew physically

---

[1] Rachel also has two younger children who remain in her care and are not involved in this CINA case.

abused their daughter. Although the abuse allegation was not confirmed[2] and the DHS safety plan expired on March 13, 2015, J.G.S. refused to return to her father's home. Matthew agreed J.G.S. could stay with Rachel through her spring break and return to his home on March 22, 2015.

But on March 17, 2015, Rachel took J.G.S. to the Montgomery County Memorial Hospital after the girl became "uncontrollable" and reportedly tried to jump out of a moving car. An ambulance transported J.G.S. to the University of Iowa Hospitals and Clinics where she was committed to the adolescent and child psychiatry unit. This occasion marked the third time J.G.S. had undergone a mental health commitment; at the time of each commitment, the child had been in her mother's care.

During J.G.S.'s hospitalization, Rachel became "verbally aggressive" with the medical staff and made derogatory comments about them in front of her then nine-year-old daughter. The girl's doctors determined Rachel's interactions with J.G.S. at the hospital should be supervised. On one occasion, Iowa City police were asked to escort Rachel out of the hospital. The hospital also enacted their threat-assessment-team protocol due to the volatility of Rachel's behavior.

Rachel also pulled her son J.C.S. into the fray. The twelve-year-old boy was scheduled for a two-hour visit with Rachel in Red Oak on March 31, 2015. Instead, the boy left a message for his father that he would be missing a week of school to spend time with his mother. Matthew enlisted the Red Oak police for

---

[2] The DHS did confirm a physical-abuse assessment against the girl's paternal grandmother, but determined the incident was isolated and unlikely to occur again. The incident involved the grandmother demanding J.G.S. turn over her cell phone and grabbing the girl by the wrist while the girl was sending a text message asking Rachel to come pick her up.

help retrieving his son, unaware that J.C.S. was in Iowa City with Rachel and her boyfriend. During this time, Rachel sent text messages to Matthew telling him J.C.S. was afraid he would get in trouble with his father for spending time with her. J.C.S. later denied expressing fear of his father.

On April 5, 2015, Rachel refused to open her door to the Red Oak police when they arrived to take J.C.S. back to his father. The police eventually arrested Rachel for violating a custodial order.

On April 16, 2015, Dr. Resmiye Oral, director of the University Hospitals' child-protection program, sent a letter to the DHS with updated progress notes on J.G.S. The pediatrician diagnosed the child with oppositional defiant disorder, anger management problems, and poor mood control. Dr. Oral related the girl's difficulties to child abuse. Dr. Oral opined, "This child has been emotionally abused by her mother leading to mental injury, which presented itself as behavioral problems that prevented the child from functioning in her optimal emotional and physical capacity."

On April 24, 2015, the State filed a petition alleging J.G.S. and J.C.S. were CINA under section 232.2(6)(c)(1), (6)(c)(2), and (6)(f). On August 7, 2015, the mother filed a motion to dismiss the State's petition alleging section 232.2(6)(c)(1) was unconstitutionally vague and overbroad, the State's petition failed to provide her sufficient notice, and the State's experts suffered from "conformational bias." The State amended the petition on August 10, 2015, to add more-detailed factual allegations and later moved to dismiss paragraph (6)(f) as a ground for adjudication. The juvenile court held the adjudication hearing across four days: August 25, October 1, October 9, and October 15, 2015.

The State called Dr. Oral to testify regarding her evaluation of J.G.S. during the girl's hospitalization. The pediatrician testified J.G.S. was a "highly burdened child"—an emotional state that came from both parents. Dr. Oral explained that Rachel engaged in "parental alienation"—which the doctor described as one parent "brainwashing" a child against the other parent, usually in the context of a custody battle. The doctor further explained the father and paternal grandmother probably didn't understand the "pathophysiology of the child's behaviors" when she rebelled against them; "when they don't understand parental alienation, they may start feeling this child hates me." Dr. Oral also expressed concern about Rachel's behavior toward her daughter's medical providers at University Hospitals. Dr. Oral offered the following observations about the mother:

> [W]e're talking about an intelligent woman here, the mother, who is a therapist herself, and she would know much better than any lay person to compose herself and display herself as a totally functional individual to providers at a hospital setting; but she didn't. She was acting like an adolescent in that setting just to win the love or gain the love of her child and to prove to her child that she's the only person that she can trust and she can't trust anybody else.

Dr. Oral attributed the behavioral problems displayed by J.G.S. to the emotionally abusive conduct of the mother. Dr. Oral ultimately determined J.G.S. suffered a mental injury "caused by parental alienation and corruption of the child by her mother."

In its adjudicatory order issued November 11, 2015, the juvenile court took judicial notice of the appeal decision issued by our court in June 2015 in the modification action between Rachel and Matthew. Our court affirmed the placement of physical care with Matthew, noting the following:

Neutral witnesses described the child's severe tantrums in Rachel's presence and Rachel's aggravation of the tantrums. They stated the behaviors only occurred around Rachel. These uncontrolled episodes placed the child's safety at risk. Rachel conceded as much, testifying the child made "herself unsafe and other people around her unsafe as well."

The juvenile court found Dr. Oral's testimony was "compelling and persuasive" and concluded the State proved by clear and convincing evidence that both children should be adjudicated CINA under section 232.2(6)(c)(1). The mother filed a motion under Iowa Rule of Civil Procedure 1.904(2) on November 26, 2015, asking the court to reconsider its adjudication and re-examine the evidence. On January 26, 2016, the juvenile court denied the rule 1.904(2) motion and issued a dispositional order, continuing the CINA adjudication and placing both children in the care of their father with protective supervision by the DHS.

The mother challenges the adjudication and dispositional orders.

## II. Scope and Standards of Review

We review CINA cases de novo. *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). While we are not bound by the juvenile court's factual findings, we give them weight, especially when witness credibility is at issue. *Id.* We also review constitutional claims de novo. *In re C.M.*, 652 N.W.2d 204, 209 (Iowa 2002). Because the mother is claiming a statute is unconstitutional, she must "negate every reasonable basis upon which the statute could be upheld." *See id.* We generally review evidentiary rulings for an abuse of discretion. *Interest of E.H. III*, 578 N.W.2d 243, 245 (Iowa 1998). To the extent the mother's claims rest on statutory interpretation, we review for correction of legal error. *Id.*

### III. Analysis of Mother's Issues

The mother advances five issues in support of her request to dismiss the CINA cases.[3] First, the mother alleges she was denied due process because the State's petition failed to provide notice of how her acts or omissions cause mental injury to her children. She also complains the court "allowed the proof offered by the State to exceed the scope of the allegations." Second, she contends the State did not prove by clear and convincing evidence the statutory basis for adjudication. Third, she attacks the constitutionality of section 232.2(6)(c)(1). Fourth, she alleges the court violated Iowa Rule of Evidence 5.404(b) in considering her prior bad acts. And fifth, she alleges the court's reliance on testimony from the State's expert was the product of "tunnel vision" and denied the mother due process. We will address each issue in turn.

### A. Due Process and Notice

Rachel first argues she was denied due process because the CINA petition did not afford her proper notice of the State's allegations concerning her acts or omissions. Both the federal and state constitutions provide no person shall be deprived of life, liberty, or property without due process of law. *See* U.S. Const. amends. V, XIV, § 1; Iowa Const. art. I, § 9. "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). A

---

[3] The mother's petition on appeal also asks us to rule that the child abuse finding against her is unfounded and order it expunged from the central abuse registry under Iowa Code section 235A.18(2). We have previously decided a juvenile court has discretion under that statutory provision to grant parents a hearing concerning expungement of information from the central registry. *In re A.J.*, 821 N.W.2d 280, 284-85 (Iowa Ct. App. 2012). Because we affirm the CINA adjudication, we decline to address the expungement issue.

parent has due process rights relating to a CINA proceeding. *See In re A.M.H.*, 516 N.W.2d 867, 870 (Iowa 1994).

The State filed its original petition on April 24, 2015, alleging generally that J.G.S. and J.C.S. were CINA. On August 7, 2015, the mother moved to dismiss the petition, arguing, among other things, that the petition failed to specify what acts she committed that caused or were imminently likely to cause mental injury to the children. The State amended the petition on August 10, 2015, specifically referencing Rachel's "uncontrolled and manipulative behavior toward University of Iowa hospital staff" where she "had [J.G.S.] placed on a mental health committal." The amended petition also alleged Rachel had attempted to "poison" her daughter's relationship with Matthew, who had sole custody of the children. As for J.C.S., the amended petition recounted the incidents in late March and early April 2015 when the mother failed to return her son to Matthew's care, refused the police request to do a welfare check, and locked herself in the house with the boy.

We believe the amended petition adequately informed the mother of the factual basis for the State's allegations that her children were being harmed or were at imminent risk of harm from her efforts to manipulate them and create an estrangement from their father. *See Interest of Hewitt*, 272 N.W.2d 852, 857 (Iowa 1978) (noting "a general statement of the facts relied on to support the petition must be stated as a minimum"). The mother's attorney was well prepared for the adjudication hearing and provided vigorous representation. On this record, we find no lack of notice resulting in the denial of due process.

Rachel also alleges the proceedings were "fundamentally unfair" because the juvenile court failed to limit the evidence presented at the hearing to matters alleged in the State's petition and because her daughter's troubling behaviors were explained by previous mental health diagnoses. Rachel does not fully develop these evidentiary claims. Accordingly, we find neither allegation rises to the level of a due process violation. *See generally A.M.H.*, 516 N.W.2d at 870 (listing due process rights as including (1) notice of hearing, (2) confrontation and cross-examination of adverse witnesses, (3) representation by counsel, (4) an impartial decision maker, and (5) a decision based solely on legal rules and the evidence presented at the hearing). We conclude the mother received due process in the juvenile court proceedings.

## B. Clear and Convincing Evidence of Mental Injury

The juvenile court based its CINA adjudication on the following provision:

"Child in need of assistance" means an unmarried child:
. . . . .
c. Who has suffered or is imminently likely to suffer harmful effects as a result of any of the following:
(1) Mental injury caused by the acts of the child's parent, guardian, or custodian.

Iowa Code § 232.2(6)(c)(1).

Rachel contends the State fell short of proving her daughter suffered a mental injury, or her son was imminently likely to suffer a mental injury, or that Rachel's behavior was the source of the abuse. Rachel also argues the court should require proof that she *intentionally* inflicted injury on her children and require proof of *substantial* mental injury.

The State counters that if the Iowa legislature had intended to require proof of a parent's intentional infliction of substantial mental injury it would have included those terms in the CINA definition at section 232.2(6)(c)(1). The State further explains the purpose of the child welfare provisions in chapter 232: "The statutes focus on the best interests of children and recognize that parents might not always know what acts or omissions are causing their child harm. Yet, the fact remains that the act or omission is indeed causing physical or mental harm to the child." We agree with the State's statutory interpretation. Appellate courts may not add modifying words to a statute under the guise of judicial construction. *See City of Asbury v. Iowa City Dev. Bd.*, 723 N.W.2d 188, 197 (Iowa 2006).

When we apply the record evidence to the actual language of the statute, we find clear and convincing proof in support of the CINA adjudication. In the context of section 232.2(6)(c), "harmful effects" relate to "the physical, mental or social welfare of a child." *In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014). A "mental injury" is defined as a "nonorganic injury to a child's intellectual or psychological capacity as evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior." Iowa Code § 232.2(35). We have previously affirmed a CINA adjudication based on the "mental injury" alternative where the parents placed their children in the middle of continued hostilities following their divorce, resulting in all three children attempting to harm themselves due to the emotional distress. *In re J.S.*, No. 14-1014, 2014 WL 4938012, at *2-3 (Iowa Ct. App. Oct. 1, 2014); *see also In re E.R.*, No. 14-0850, 2014 WL 4937999, at *5 (Iowa Ct. App. Oct. 1, 2014) (suggesting "mental injury" alternative would protect children whose parents'

behaviors toward each other and in the presence of the children have created harm).

Dr. Oral opined that J.G.S. was an "emotionally highly burdened child." The pediatrician linked the child's behavioral problems to Rachel's manipulation and pattern of interactions intended to alienate the girl from both medical providers and her father. The juvenile court found Dr. Oral's opinions to be persuasive, and we defer to that credibility finding. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995) (explaining we are "influenced by the favorable vantage point" of the juvenile court). In addition, experienced child-protection worker Dan Dorrance had concerns about the emotional well-being of J.C.S., who "was exposed to Rachel being arrested for failure to comply with the custodial order, was taken out of school for approximately a week, and not returned to Matt's care after what should have been a two-hour visit." The record showed J.C.S. did not display behavioral problems, but struggled in school and had "ADHD tendencies." After reviewing anew the evidence presented by the State, we find clear and convincing proof that J.G.S. suffered and J.C.S. was imminently like to suffer harmful effects as a result of mental injury caused by Rachel's misguided efforts to win the devotion of the children and alienate them from Matthew.

**C. Vagueness and Overbreadth Challenge to Mental-Injury Statute**

Rachel next attacks section 232.2(6)(c)(1) as "unconstitutionally vague" both on its face and as applied to her, and alternatively as "unconstitutionally overbroad." Vagueness challenges are generally directed toward penal statutes, which "must give a person of ordinary intelligence fair warning of what is

prohibited, and, in order to avoid arbitrary and discriminatory enforcement . . . it must provide an explicit standard for those who apply [them]." *See State v. Pilcher*, 242 N.W.2d 348, 353 (Iowa 1976). Where the statute under attack is remedial or civil rather than penal in nature, courts require "a less strict standard of definiteness." *See Miller v. Iowa Real Estate Comm'n.*, 274 N.W.2d 288, 292 (Iowa 1979). An overbreadth analysis is confined to alleged denials of First Amendment rights. *State v. Armstrong*, 787 N.W.2d 472, 477 (Iowa Ct. App. 2010). Because Rachel does not allege the statute infringes on her First Amendment rights, we do not find the overbreadth doctrine applies here.

In arguing her vagueness claim to the juvenile court, Rachel posed the following rhetorical questions:

> What sort of mental injury is meant? Temporary acts of anger or sadness because of acts of parent in punishing a child? A serious tantrum when the child fails to get her way? What is the child's normal range of performance? How is that determined and by whom?

Rachel ultimately argued the statute provided "too much opportunity for selective enforcement."

The juvenile court rejected her vagueness claim, as do we. In assessing whether a statute is void-for-vagueness, we presume constitutionality and give the provision any reasonable construction to uphold it. *State v. Showens*, 845 N.W.2d 436, 441 (Iowa 2014). Rachel's argument fails to overcome the presumption of constitutionality. The description of a child in need of assistance in section 232.2(6)(c)(1), coupled with the definition of "mental injury" in section 232.2(35), gives sufficient notice to parents as to the type of harm—caused by their actions—that will trigger juvenile-court intervention. The definition of mental

injury includes the phrase "observable and substantial impairment in the child's ability to function." Those specific standards dispense with the mother's concern that a child's temporary anger or occasional tantrum could be mistaken for a mental injury. The definition of "mental injury" does not require parents or professionals to guess at its meaning.

Moreover, we are mindful that it is not only the mother's rights at issue here; chapter 232 is premised on best serving the welfare of each child under the jurisdiction of the court. Iowa Code § 232.1. "An 'impossible standard of statutory clarity' would be inappropriate in cases involving child care and custody." *In re Clark*, 281 S.E.2d 47, 56 (N.C. 1981). A certain amount of flexibility in the CINA definition is necessary to protect children from a wide range of abusive conduct. We find the provisions at issue provide sufficient guidance for juvenile courts to administer them uniformly. Accordingly, we reject Rachel's void-for-vagueness argument.

### D. Prior Bad Acts Evidence

The rules of evidence generally apply in adjudicatory hearings. Iowa Code § 232.96(3). Rachel contends the juvenile court erred in relying on evidence of her "prior bad acts" in contravention of Iowa Rule of Evidence 5.404(b). She contends the juvenile court "seems to find Rachel is a bad person." She specifically mentions objecting to three exhibits accepted by the juvenile court at the CINA hearing: two documents showing a settlement regarding the suspension of Rachel's counseling license in Nebraska and the appellate decision involving the modification of child custody in her dissolution case. She objected on grounds of relevance, rules 5.401 and 5.402, and that

the exhibits were more prejudicial than probative, rule 5.403. Rachel does not assert she raised a prior-bad-acts objection at the adjudicatory hearing.

The mother's general relevancy objections did not preserve error on her appellate argument alleging these documents constituted improper evidence of her prior bad acts under rule 5.404(b). *See State v. Mulvany*, 603 N.W.2d 630, 633 (Iowa Ct. App.1999). Moreover, the mother's invocation of rule 5.404(b) for the first time in her rule 1.904(2) motion came too late to preserve error. *See Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 694 (Iowa 2013) ("[A] party fails to preserve error on new arguments or theories raised for the first time in a post-trial motion.").

Even if Rachel had preserved error on her prior-bad-acts argument, the juvenile court did not emphasize the disputed exhibits in reaching its decision. The juvenile court did not find J.C.S. and J.G.S. were CINA because their mother was a "bad person." Instead, the court properly determined the children needed DHS supervision and it would be contrary to their welfare to have unsupervised visitation with their mother at this time.[4]

### E. Due Process and "Tunnel Vision"

Finally, Rachel argues Dr. Oral, the State's expert—and the juvenile court in crediting the doctor's testimony—fell victim to "tunnel vision" and thereby denied Rachel a fair hearing. Rachel cites a law review article that defines "tunnel vision" as a phenomenon of the criminal justice system where authorities

---

[4] In the dispositional order, the juvenile court quoted J.G.S.'s counselor as reporting: "Rachel has expressed desire to do what is best for her children, she admits to her over the top actions that led them to where they are today." We are hopeful that Rachel's expressed desire will translate into affirmative progress in her relationship with the children.

will "focus on a suspect, select and filter the evidence that will 'build a case' for conviction, while ignoring or suppressing evidence that points away from guilt." *See* Keith A. Findley & Michael S. Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, 2006 Wis. L. Rev. 291, 292 (2006). We find Rachel's argument unconvincing in the child-welfare context. Rachel is not a criminal defendant in this case. Neither the pediatrician, nor the DHS, nor the juvenile court concerned themselves with building a prosecution against the mother. Rather, the question was whether her children needed state assistance because their physical, mental, or social welfare was endangered by the mother's actions or omissions. *See generally In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014) (reiterating that the State bears "a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it").

Finding no merit to the mother's challenges, we affirm the juvenile court's orders.

**AFFIRMED.**