STATE of Iowa, Appellant,

v.

TRIGON, INC. and Karl Thompson,
Appellees.

No. 02–0213.

Supreme Court of Iowa.

Feb. 26, 2003.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, and David C. Thompson, County Attorney, for appellant.

Matthew Nagle and Patrick J. O'Connell of Lynch, Dallas, Smith & Harman, P.C., Cedar Rapids, for appellees.

NEUMAN, Justice.

On a windy December day, nineteen-year old Dan Ross fell sixty feet to his death while working on a telecommunication tower being built by defendant Trigon, Inc. Following an investigation, the corporation and its president, defendant Karl Thompson, were charged with willfully violating Iowa's Occupational Health and Safety Act (IOSHA), a serious misdemeanor. *See* Iowa Code §§ 88.5, 88.14(5) (1999).

Thompson moved to suppress statements made by him to an IOSHA inspector shortly after the accident. The district court suppressed the statements on the ground they were secured in violation of Thompson's rights under the Fifth Amendment. We granted the State's application for discretionary review.

Given the constitutional implications of the case, our review is de novo. *State v.*

*Deases,* 518 N.W.2d 784, 789 (Iowa 1994). Because the record reveals neither a custodial interrogation nor admissions that were coerced or otherwise involuntary, we reverse the district court's suppression order and remand for further proceedings.

## I. Background.

The fatality at Trigon's work site prompted the Iowa Department of Labor to send a senior industrial hygienist, Jeff Ellis, to perform an inspection and investigate the facts surrounding Ross's fall from the tower. Ellis is not a peace officer. He carries no badge or firearm and has no authority to arrest, or even issue citations, for workplace hazards. His job is to perform scheduled IOSHA inspections and investigate workplace accidents.

On the day following the accident, Ellis met Trigon's president, Karl Thompson, at the company's office near Cedar Rapids. Ellis's appearance was not prearranged, but neither was it unexpected. Ellis characterized the meeting as a routine "opening conference" in which he explained the nature of the investigation, requested the opportunity to talk with employees familiar with the accident, and inquired about the company's safety and health programs and policies. The discussion, described by both men as business-like but friendly, lasted roughly ninety minutes.

By Ellis's account, Thompson spoke "quite freely" concerning the Ross incident. The fatal fall occurred on Ross's first day on the job, and Thompson admitted knowing little about his new employee. Ellis asked to see copies of Trigon's safety and health program, including training documentation for Ross. Thompson advised that most of the materials were in a van headed to a job site in Minnesota. When asked what safety training Ross had received before scaling the tower, Thompson reportedly replied that it was his prac-tice to "train after we can see if they can hack it."

Thompson recalled (and Ellis did not dispute) that no *Miranda* warnings preceded their conversation. Thompson, mindful of the seriousness of any work-related fatality, asked Ellis whether he "needed an attorney present." Ellis reportedly answered "no." When asked about this conversation, Ellis acknowledged Thompson's inquiry but said that, as in all such IOSHA investigations, he advised Thompson it was the employer's decision whether to have a lawyer present. Both men agreed that no further discussion on the point occurred.

Further facts will be detailed as they pertain to the issue on appeal.

## II. Issue on Appeal.

Based on the testimony sketched above, the district court suppressed all statements made by Thompson to Ellis, reasoning that Thompson had "requested an attorney" and so "all further interrogation should have been suspended until the Defendant had an opportunity to contact an attorney." The State assails this conclusion on appeal. It claims that exclusion under this record is neither compelled by *Miranda* nor otherwise required under the Fifth Amendment's guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. For the reasons that follow, we agree.

**A. Miranda.** In *Miranda v. Arizona,* the Supreme Court held that an individual taken into custody or otherwise significantly deprived of his freedom must, before questioning begins, be advised of certain now-familiar rights to (1) remain silent, and (2) the representation of counsel, retained or appointed. *Miranda,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16

L.Ed.2d 694, 726 (1966). In the absence of proof that such warnings have been given, or that the person interrogated has knowingly and intelligently waived those rights, "no evidence obtained as a result of interrogation can be used against him." *Id.* at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726; *accord State v. Davis,* 446 N.W.2d 785, 787–88 (Iowa 1989). For purposes of applying *Miranda's* prophylactic rule, the status of the interrogating official is not determinative. *Deases,* 518 N.W.2d at 790. "[W]hen a state official conducts a custodial interrogation that would require a *Miranda* warning if undertaken by a police officer, then the official is similarly required to give a *Miranda* warning." *Id.*

*Miranda* warnings need not be given, however, unless the record establishes both custody and interrogation. *State v. Countryman,* 572 N.W.2d 553, 557 (Iowa 1997); *Deases,* 518 N.W.2d at 789. Only the question of custody is at issue here. On that issue this court looks at four factors:

> (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of [his] guilt; and (4) whether the defendant is free to leave the place of questioning.

*Countryman,* 572 N.W.2d at 558; *see also Deases,* 518 N.W.2d at 789.

The record before us yields no support for the conclusion that Thompson's interview with Ellis was custodial in nature. We begin by addressing the first and fourth factors together. Thompson was not "summoned" to meet with Ellis at some official location. Their meeting, though initiated by Ellis, took place during normal business hours in Thompson's office. Ellis chatted sociably with Thompson's staff and, by all accounts, their meeting was cordial. And while Thompson understandably harbored a reluctance to leave while the questioning was in process, his subjective views are not controlling on the question of custody. We are obliged to examine the "objective circumstances of the interrogation." *Countryman,* 572 N.W.2d at 557. Here an objective view of the facts reveals that Thompson was interviewed in his own place of business, was not restrained in any way, and was never told he could not leave at his election. Ellis had no weapon, no badge, and no authority to arrest Thompson, restrain him or even issue a citation. In short, factors one and four suggest this was a non-custodial interrogation. *See, e.g., United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir.1985) (interrogation conducted on defendant's "own turf" not indicative of inherently coercive setting normally accompanying custodial investigation).

As for the purpose, place and manner of the interrogation, only its purpose is seriously debated by the parties. Ellis's mission was to gather facts about the fatal accident and, essentially, to determine whether the fatality resulted from a lapse in safety procedures and devices that would put other employees at risk of injury unless abated. Both he and Thompson were aware of, and discussed, the range of possible civil penalties that could be imposed if IOSHA violations were found. But no objective view of the suppression motion record would lead a reasonable person to believe that Ellis thought he was mounting a criminal investigation. The purpose of an "opening conference" was not to gather incriminating evidence. In his seventeen years with the agency, no IOSHA violation had ever resulted in a criminal prosecution. At this preliminary stage, the likelihood that his inquiry would lead to the filing of criminal charges was highly remote.

Finally, Thompson was never confronted with evidence of his "guilt" because guilt was not the focus of Ellis's questions. In short, nothing about Ellis's initial encounter with Thompson suggests that the interrogation that followed was custodial in nature. Thus, Ellis had no duty to precede his questioning with *Miranda* warnings. *See McKune v. Lile*, 536 U.S. 24, 47, 122 S.Ct. 2017, 2033, 153 L.Ed.2d 47, 67 (2002) (O'Connor, J., concurring) (no *Miranda* warnings required for non-custodial police questioning); *Helmel*, 769 F.2d at 1321 (same). The district court erred when it suppressed Thompson's statements on this ground.

**B. Voluntariness.** Even if *Miranda* warnings were not required, Thompson's statements would still be subject to suppression at the criminal trial if those statements were not made voluntarily. *Davis*, 446 N.W.2d at 788 ("[A]ny use in a criminal trial of an involuntary statement is a denial of due process requiring automatic reversal.") This privilege against compelled self-incrimination applies to questions posed in civil proceedings, formal or informal, if the answers might later be used in a criminal prosecution. *In re E.H., III*, 578 N.W.2d 243, 249 (Iowa 1998).

The burden of proving voluntariness rests on the State. *State v. Hodges*, 326 N.W.2d 345, 348 (Iowa 1982).

In order to establish the voluntariness of a defendant's inculpatory statements, the State must demonstrate from the totality of circumstances that the statements were the product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired.

*Id.* at 347 (quoting *State v. Snethen*, 245 N.W.2d 308, 315 (Iowa 1976)). Factors bearing on the issue of voluntariness include:

the defendant's age, experience, prior record, level of education and intelligence; the length of time defendant is detained and interrogated; whether physical punishment was used, including the deprivation of food or sleep; defendant's ability to understand the questions; the defendant's physical and emotional condition and his reaction to the interrogation; whether any deceit or improper promises were used in gaining the admissions; [and] any mental weakness the defendant may possess.

*Id.* at 348 (citations omitted).

Most of these factors weigh against any claim of involuntariness here. From Thompson's perspective, the circumstances surrounding the questioning could not be described as other than familiar and unthreatening. There was no deprivation or punishment involved. As for Thompson's ability to understand Ellis's questions, the record reflects the intelligence, experience, education and mental strength one might expect from a thirty-nine year old president of his own company. By these standards, there is nothing in the record to support, or even suggest, that Thompson's will was overborne or his capacity for self-determination impaired.

Thompson nevertheless contends that his admissions resulted from trickery or deceit committed by Ellis in one of two ways: (1) by discouraging Thompson from seeking the advice of counsel before answering questions, or (2) by implying that if Thompson failed to cooperate more serious repercussions would follow.

Whether or not Ellis told Thompson he did not "need" an attorney, or (as Ellis recalls) merely advised him it was his "call," the record makes plain that Thompson's inquiry on the point was equivocal at best. *See State v. Morgan*, 559 N.W.2d

603, 608 (Iowa 1997) ("[A]n inquiry regarding the need or advisability of speaking with an attorney is not an invocation of the right to counsel.") Thompson concedes as much on appeal. Moreover, even if we assumed Ellis's response discouraged Thompson from consulting counsel, the statement could not fairly be characterized as deceptive or designed to coerce incriminating admissions. The record plainly reveals that Ellis was as surprised as Thompson that this investigation led to criminal charges. Given the totality of the circumstances, we do not believe Ellis's opinion regarding counsel could be said to render involuntary the subsequent statements by Thompson, a corporate executive, while being questioned in his own office.

That brings us to Thompson's claim that Ellis's unannounced arrival at his office implied a power to shut down his business if Thompson refused to answer his questions. As this court noted in *In re E.H. III*, "[w]hen the State 'compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment.' " *In re E.H. III*, 578 N.W.2d at 249 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 805, 97 S.Ct. 2132, 2135, 53 L.Ed.2d 1, 7 (1977)). Thompson rightly notes that the Supreme Court has reiterated this principle in compelled-testimony cases involving such "potent sanctions" as termination of employment, loss of professional license, ineligibility for government contracts and loss of right to hold public office. *See McKune*, 536 U.S. at 48, 122 S.Ct. at 2033, 153 L.Ed.2d at 67 (O'Connor, J., concurring) (describing cases).

Thompson's reliance on these cases, however, is misplaced. The record before us contains no proof of threatened sanctions, direct or implied. As we observed in *Hodges*, "[t]he question of voluntariness is a matter of sorting out the impetus for the inculpatory statement." *Hodges*, 326 N.W.2d at 348. The evident impetus for Thompson's candor was his belief that Ellis could shut down his business if he did not answer his questions. This mistaken belief originated with Thompson, not Ellis. Not only did Ellis not have the power to compel Thompson's cooperation, the record furnishes no proof from which to infer that Ellis encouraged Thompson's erroneous belief.

Unlike the cases cited above in *McKune*, no statutory scheme compelled Thompson's cooperation on pain of losing his business. *See, e.g., Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562, 567 (1967) (excluding testimony coerced under statute requiring public employees to surrender Fifth Amendment privilege or forfeit employment). This case is more akin to *Davis*, where the defendant was charged with being a felon in possession of a firearm after he requested the return of a shotgun used by his relative in a crime. *Davis*, 446 N.W.2d at 790. Davis claimed he was influenced to answer a deputy's inquiry regarding ownership of the weapon by the belief that if he did so, the gun would be returned to him. We held Davis's inculpatory statements about the gun were not rendered involuntary by the deputy's failure to correct his misperception. *Id.* So also here, we are convinced that any economic concern driving Thompson's willingness to speak to Ellis stemmed from his own misapprehension of the law, not any coercion on the State's part.

In short, Thompson's statements to the IOSHA inspector were not coerced or otherwise involuntary. Thus the district court should not have suppressed them.

We therefore reverse and remand for further proceedings.

**REVERSED AND REMANDED.**