# IN THE SUPREME COURT OF IOWA

No. 09–1798

Filed September 30, 2011

**STATE OF IOWA,**

    Appellee,

vs.

**JESSE JOHN PEARSON,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Bruce B. Zager (motion to suppress) and James C. Bauch (trial), Judges.

Appellant seeks further review of his convictions, sentences, and judgment for first-degree robbery, willful injury causing serious bodily injury, and going armed with intent. **DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

Mark C. Smith, State Appellate Defender, David Arthur Adams, Assistant State Appellate Defender, and Jordan T. Smith, Student Legal Intern, for appellant.

Thomas J. Miller, Attorney General, Darrel L. Mullins, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Kimberly A. Griffith, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

This case presents our first opportunity to address the impact of a defendant's underage status on the *Miranda* custody analysis in light of *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (remanding to reconsider custody issue in light of thirteen-year-old suspect's age). Our analysis turns on the specific circumstances of this interview: a confession received by a familiar social worker conducting the juvenile's status assessment at his youth home—without the coercive pressure of an unfamiliar police officer interrogating him at the station to solve a crime.

Defendant, Jesse Pearson, a seventeen-year-old runaway from the Bremwood Residential Treatment Center in Waverly, robbed an elderly, mentally disabled man in the victim's Waterloo home and beat him bloody with a cast iron frying pan. When apprehended later that day by the Waterloo police, Pearson refused to waive his *Miranda* rights and said he would not talk before he returned to Bremwood and spoke with his lawyer. The next morning, however, he promptly confessed to his social worker, Marie Mahler, without his attorney present. The district court ruled Mahler's interview was not a custodial interrogation implicating *Miranda* safeguards and denied Pearson's motion to suppress this confession. A Black Hawk County jury convicted him of first-degree robbery, willful injury, and going armed with intent. The court of appeals affirmed the evidentiary ruling allowing the jury to hear his confession, rejected an ineffective-assistance-of-counsel claim, and affirmed his convictions for robbery and willful injury, but reversed his conviction on the "going armed" charge based on an instructional error. We granted further review to decide whether Pearson's confession to Mahler was admissible.

We conclude Mahler's interview of Pearson was not a custodial interrogation for *Miranda* purposes and that his confession to her was voluntary and admissible. Accordingly, we affirm his judgment and sentence for robbery and willful injury. The court of appeals decision shall stand rejecting the ineffective-assistance-of-counsel claim and granting a new trial on the "going armed" charge.

## I. Background Facts and Proceedings.

Pearson had known Mahler for nearly eight years, since she was assigned his caseworker when he was age eleven after he was adjudicated a child in need of assistance (CINA). Mahler is a social worker employed by the Department of Human Services (DHS) in Buchanan County. As Pearson's caseworker, Mahler oversaw his juvenile proceedings and monitored his education, peer interactions, health, and general welfare. In July 2009, Pearson, seven months shy of his eighteenth birthday, resided at Bremwood by court order. Bremwood is a youth home, not a prison, jail, or juvenile detention facility. Bremwood provides a "home like" atmosphere to juveniles needing an intensive rehabilitative environment. At Bremwood, Pearson lived in a cottage with a kitchen, bathroom, living area, and bedroom. Despite these amenities, Pearson and D.S., another Bremwood resident, ran away.

They turned up the morning of July 14 at the door of the Waterloo home of Peter Weiss, a sixty-nine-year-old, mentally challenged man who lived alone. Weiss recognized D.S. from the neighborhood and let them enter when they asked to use his phone and bathroom. Once inside, Pearson began going through Weiss's drawers, over the protests of the elderly resident. Matters escalated when Pearson took a cast iron frying pan from the stove and hit Weiss over the head with it repeatedly.

Pearson's blows left a clump of Weiss's hair on the kitchen floor and broke the iron handle off the pan. Weiss was knocked down with a fractured skull and multiple scalp lacerations that bled profusely. The teenagers ran out the door.

Weiss was able to call 9-1-1, and the operator kept him on the line as an ambulance and police were dispatched. Neighbors who spotted the teens hiding in bushes placed another call to police. Pearson was apprehended with Weiss's blood on his shirt and taken to the Waterloo police station. Officer Robert Michael reached Pearson's mother by phone, and she gave permission for the police to interview her son. Pearson was already a juvenile delinquent experienced in police procedures. Officer Michael read Pearson his *Miranda* rights, including that he had the right to remain silent, that if he chose to talk, anything he said would or could be used against him, and that he had a right to an attorney. Pearson responded by refusing to sign a form waiving his *Miranda* rights and by stating that he was not going to talk until he returned to Bremwood and spoke with his attorney. Pearson already had a public defender assigned to represent him on pending juvenile charges in Buchanan County. Later that afternoon, Bremwood staff picked Pearson up at the Waterloo police station and drove with him back to the youth home. His victim spent the night in the hospital with fifteen staples in his scalp to close his head wounds.

Bremwood staff moved Pearson to a different room called Trinity Cottage, but he was not locked in it. Trinity is windowless and positioned where staff can observe the doorway. Staff relocated Pearson there because he had run away and faced new charges. On July 15, Mahler arrived at 8 a.m. to meet with Pearson. She had already been told by Pearson's mother and Bremwood staff that Pearson had run away

and been involved in an assault on an older man. Mahler also had spoken with a public defender assigned to Pearson's juvenile case who told her he would tell Pearson "not to talk to the officers or anybody about the incident." This defense counsel, however, did not tell Mahler to refrain from talking with Pearson. Mahler did not speak with the Waterloo police at this time.

As Pearson's CINA caseworker, Mahler needed to interview him to reassess his status after he had run away from Bremwood and been arrested. She was concerned Bremwood would evict him. She did not interview Pearson at the request of the Waterloo police, but rather, as his social worker. When questioned about the purpose of her interview at the suppression hearing, Mahler testified as follows:

> Q. Okay. So what's your protocol; what's the policy after a child is picked up after being on the run, what are you supposed to do after you're advised that he's back? A. Usually I go and meet with the child to see where they were, what they were doing, what they were thinking, why they ran, what happened while they were on the run, and just in general how he was doing; and then talk with Bremwood staff about what they were going to do afterwards, were they going to give me a ten-day notice, which means they want me to remove him from their program within ten days and find another placement for him, whether I was going to approach the juvenile judge about what was happening.

> Q. What's the purpose of talking to the defendant about what you've just said in talking to Bremwood staff about placement? A. A lot of times, depending on behaviors and incidents within the facility, a program will only tolerate so much. And they have the right to give the Department of Human Services, and it has to be in writing, a ten-day notice that says you have ten days to remove him and place him in another — at that time his juvenile court order said group care, so it would have been another group care facility that I would have had to look for.

> Q. So is the purpose for talking to him for — to assist law enforcement, or is it to — or act with law enforcement, or is it to talk to him for your placement issues and where you're going to be putting him and planning for the juvenile court case? A. It is to plan for the [Buchanan County]

juvenile court case, but it is also to plan based on what Jesse's feeling, which his needs are, and trying to find out where his mind-set was, what caused him to want to run in the [first] place.

Pearson was sleeping when Mahler arrived the morning after he assaulted Weiss, and staff awakened him. She met with him in Trinity Cottage and kept the door open so the staff could intervene if he became aggressive. Mahler first asked Pearson how he was doing, and he said, "I'm okay." Then she asked him, "Did you actually do what everybody's saying you did?" He said, "What did I do?" Mahler responded, "Did you actually hit an old man?" Without any further prompting, Pearson confessed: "Yeah. So? I hit him over the head with a frying pan." After making this admission, Pearson told Mahler his lawyer "told him to shut up" and that he had not answered questions from the police. Mahler asked no further questions about the assault at that time and spent the next hour talking with Pearson about why he had run away from Bremwood and where matters would go from there.

Mahler filed a report on her caseworker interview with the Buchanan County authorities handling Pearson's previously pending CINA and juvenile proceedings. Her report noted Pearson's "cocky" attitude and lack of remorse. She did not submit a report to the Black Hawk County Attorney or Waterloo police investigating the Weiss assault and robbery. Mahler was surprised to learn that the Waterloo police arrested Pearson the afternoon of July 15 and took him to jail. Days later, Officer Michael asked Mahler to provide a statement. She assumed information from her report to Buchanan County authorities had reached Michael's attention. Mahler refused to give the police a statement until her superiors at DHS in Des Moines authorized her to do so. Mahler also spoke with Pearson on August 7 when she asked him

what the victim's injuries had been. Pearson told her the victim had fourteen to fifteen staples in his head and a fractured skull. Mahler again noted Pearson showed no remorse. On September 4, Pearson told Mahler that D.S. told him to hit the victim, so he did. Pearson admitted they were trying to get clothes from Weiss's home.

Pearson was charged in Black Hawk County with robbery in the first degree, willful injury, and going armed with intent. Pearson moved to transfer the case to juvenile court. The district court noted his "extended history of involvement with the juvenile court, primarily in Buchanan County," and "that the predominant delinquent history of the Defendant involves assault." Pearson had repeatedly assaulted his mother beginning at age eight and had assaulted police officers. The district court found "no evidence of any reasonable prospects for rehabilitation" and that Pearson "is a significant threat to the community." Accordingly, his motion to transfer was denied and the case proceeded in district court.

Pearson's trial counsel filed a motion to suppress his July 15 confession to Mahler. The district court denied the motion, concluding "the *Miranda* warning was not required because there was neither custody nor interrogation of the defendant." The district court found "the record is devoid of any threats, deceit, or other improper promises which were made to Pearson prior to his making admissions." The district court concluded Pearson's statements "were made willingly and voluntarily and satisfy due process rights."

The motion to suppress did not address the admissions Pearson made to Mahler on August 7 and September 4. Mahler testified at the jury trial regarding Pearson's confession and subsequent admissions. Weiss and D.S. both testified at trial that Pearson beat Weiss with the

frying pan. Other witnesses established that DNA testing confirmed Weiss's blood was on the shirt worn by Pearson when he was arrested the day of the assault. Weiss's blood was not found on the clothing worn by D.S.

The jury convicted Pearson on all three counts. The district court merged the conviction for willful injury into the first-degree robbery conviction for sentencing purposes and imposed a twenty-five-year prison sentence and a concurrent five-year sentence for going armed with intent. Pearson appealed on multiple grounds, including that the district court erred in allowing Mahler to testify about his July 15 confession, that the evidence was insufficient to support his conviction for going armed because he arrived at Weiss's home unarmed, that the uniform jury instruction on that charge omitted the element of "movement," and that his trial counsel was ineffective for failing to move to suppress Mahler's testimony about his subsequent admissions on August 7 and September 4.

The court of appeals affirmed the district court on all but one ground. The court of appeals held Mahler's July 15 interview was not a custodial interrogation requiring a *Miranda* warning and affirmed the order denying the motion to suppress this confession to her that day. The court of appeals rejected Pearson's ineffective-assistance-of-counsel claim by concluding he failed to show prejudice because his admissions on August 7 and September 4 were cumulative to properly admitted evidence. The court of appeals found sufficient evidence to support a conviction for going armed, concluding the frying pan was a weapon and Pearson moved across the kitchen armed with it. Finally, the court of appeals reversed and remanded for a new trial on that charge based on

the omission of the "movement" element in the marshaling instruction. We granted Pearson's application for further review.

## II. Issues.

We exercise our discretion on further review in this case to decide a single issue: whether the district court erred by denying Pearson's motion to suppress his July 15 confession to Mahler. The court of appeals decision shall stand as the final decision in this appeal on the ineffective-assistance-of-counsel claim and the going armed charge.[1] *See State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010) (electing to review only one of three issues raised on appeal and leaving the court of appeals decision as final on the remaining issues).

## III. Scope of Review.

We review de novo a district court's refusal to suppress statements allegedly made in violation of constitutional safeguards. *State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010). We independently evaluate the totality of the circumstances as shown by the entire record. *Id.* " 'We give deference to the district court's fact-findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings.' " *Id.* (quoting *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001)).

---

[1]We agree with the court of appeals that the Iowa State Bar Association Jury Instruction Committee's Criminal Jury Instruction 800.15, which marshals the elements of going armed with intent, omits "proof of movement"—an element of the offense. *See* Iowa Code § 708.8 (2009); *State v. Taylor*, 596 N.W.2d 55, 57 (Iowa 1999) ("[G]oing armed with intent involves movement."); *State v. Ray*, 516 N.W.2d 863, 865 (Iowa 1994) ("[W]e believe the term ['going' armed] necessarily implicates proof of movement."). Evidence Pearson moved across the kitchen is sufficient to submit the issue to the jury. *See Ray*, 516 N.W.2d at 865 (movement from house to front yard sufficient). But, omission in the jury instruction of the movement element requires a new trial on the going-armed charge.

Pearson relies on the Federal Constitution without raising the admissibility of his statements under the Iowa Constitution. Consequently, we will limit our analysis regarding the admissibility of the statements to the Federal Constitution. *Id.*

## IV. The *Miranda* Custody Analysis.

"Voluntary confessions are not merely 'a proper element in law enforcement,' they are an 'unmitigated good,' ' "essential to society's compelling interest in finding, convicting, and punishing those who violate the law." ' " *Maryland v. Shatzer*, 559 U.S. ___, ___, 130 S. Ct. 1213, 1222, 175 L. Ed. 2d 1045, 1055 (2010) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694, 726 (1966); *McNeil v. Wisconsin*, 501 U.S. 171, 181, 111 S. Ct. 2204, 2210, 115 L. Ed. 2d 158, 170 (1991)).

The dispositive issue in this case is whether Mahler's July 15 interview of Pearson at Bremwood without his lawyer present was a custodial interrogation under *Miranda*. The day before, Pearson unequivocally invoked his right to remain silent and his right to counsel and expressly declined Officer Michael's invitation to waive his *Miranda* rights, ending his interrogation at the Waterloo police station before it began. *See Palmer*, 791 N.W.2d at 845–48 (reviewing procedural safeguards upon invocation of the right to remain silent and the right to counsel). Pearson relies on *Edwards v. Arizona*, which prohibits the police from initiating another custodial interrogation without counsel present. 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1884–85, 68 L. Ed. 2d 378, 386 (1981). Under *Shatzer*, confessions are presumed to be involuntary if made without defense counsel present during a custodial interrogation initiated by police within fourteen days after counsel is first requested. 559 U.S. at ___, 130 S. Ct. at 1223, 175 L. Ed. 2d at 1057.

The *Shatzer* Court, however, reiterated "*Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" *Id.* at ___, 130 S. Ct. at 1224, 175 L. Ed. 2d at 1058 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S. Ct. 3138, 3148–49, 82 L. Ed. 2d 317, 333 (1984)). Specifically, the protection of *Miranda* and its progeny extend only to custodial interrogations. *See id.* at __, 130 S. Ct. at 1223, 175 L. Ed. 2d at 1057 ("In every case involving *Edwards,* the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress."); *United States v. Cook,* 599 F.3d 1208, 1214 (10th Cir. 2010) ("But in order to implicate *Miranda* and *Edwards*, there must be a custodial interrogation."); *see also State v. Countryman,* 572 N.W.2d 553, 557 (Iowa 1997) ("*Miranda* warnings are not required unless there is both custody and interrogation.").

We begin with an overview of *Miranda* to guide our determination whether Mahler's interview falls within the "types of situations" that implicate its requirements.

**A. The *Miranda* Rationale.** The Fifth Amendment states "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, and the Amendment's protections apply to the states through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S. Ct. 1489, 1493, 12 L. Ed. 2d 653, 658 (1964). In *Miranda,* the Supreme Court adopted a set of prophylactic warnings to be given before custodial interrogations to protect the Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of questioning by the police. 384 U.S. at 467, 86 S. Ct. at 1624, 16 L. Ed. 2d at 719. The *Shatzer* Court echoed the concerns raised in *Miranda*: " 'incommunicado interrogation' in an

'unfamiliar,' 'police-dominated atmosphere,' involves psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " 559 U.S. at ___, 130 S. Ct. at 1219, 175 L. Ed. 2d at 1052 (quoting *Miranda,* 384 U.S. at 456–57, 467, 86 S. Ct. at 1618, 1624, 16 L. Ed. 2d at 713–14, 719). *Miranda* thus required police officers to warn a suspect prior to a custodial interrogation that he has a right to remain silent and the right to the presence of an attorney. 384 U.S. at 444–45, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706–07. The interrogation must halt if the suspect invokes his right to remain silent or his right to counsel. *Shatzer,* 559 U.S. at ___, 130 S. Ct. at 1219, 175 L. Ed. 2d at 1052.

The Supreme Court in *J.D.B. v. North Carolina* recently reviewed the concerns that motivated adoption of the *Miranda* safeguards and emphasized one of the evils to be avoided is coerced, false confessions from an innocent juvenile:

> Indeed, the pressure of custodial interrogation is so immense that it "can induce a frighteningly high percentage of people to confess to crimes they never committed." That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile. See Brief for Center on Wrongful Convictions of Youth et al. as *Amici Curiae* 21–22 (collecting empirical studies that "illustrate the heightened risk of false confessions from youth").

564 U.S. at ___, 131 S. Ct. at 2401, 180 L. Ed. 2d at 321 (citation omitted) (quoting *Corley v. United States,* 556 U.S. 303, ___, 129 S. Ct. 1558, 1570, 173 L. Ed. 2d 443, 458 (2009)).[2] Importantly, the *J.D.B.*

---

[2]See David L. Strauss, *Barbarous Souls* (2010), for a chilling example of a life ruined by a pre-*Miranda* interrogation. The book chronicles the story of Darrel Parker, who came home from work on December 14, 1955, to find his wife, Nancy, strangled in their bed. Police had reason to suspect an ex-convict, Wesley Peery, who had installed a fence at the Parker home the preceding week. *Id.* at 34–35, 98. Nevertheless, police investigator, John Reid, was brought in from Chicago and interrogated the grieving Mr. Parker for hours, using manipulative psychological techniques until he confessed.

Court reiterated that, because the *Miranda* safeguards "protect the individual against the coercive nature of custodial interrogation, they are required 'only where there has been such a restriction on a person's freedom as to render him in custody.'" *Id.* at ___, 131 S. Ct. at 2402, 180 L. Ed. 2d at 322 (quoting *Stansbury v. California,* 511 U.S. 318, 322, 114 S. Ct. 1526, 1528, 128 L. Ed. 2d 293, 298 (1994)) (internal quotation marks omitted).

Against this backdrop, we apply the factors for determining whether Mahler's July 15 interview of Pearson was a "custodial interrogation" under *Miranda.* We conclude the circumstances of this confession lack the coercive pressure of a custodial interrogation. Accordingly, his July 15 confession is admissible.

**B. Factors for Determining *Miranda* Custody.** The *J.D.B.* Court emphasized whether a juvenile is in custody for *Miranda* purposes is an objective inquiry:

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."

---

*See Parker v. Sigler,* 413 F.2d 459, 465–66 (8th Cir. 1969) (holding confession involuntary), *overruled on procedural grounds by Sigler v. Parker,* 396 U.S. 482, 90 S. Ct. 667, 24 L. Ed. 2d 672 (1970). Parker was released in 1970 after serving thirteen years in prison. *Barbarous Souls*, at 216. Peery ultimately confessed to the Nancy Parker murder. *Id.* at 224. Parker is now an eighty-year-old resident of Moline, Illinois. *Id.* at 245. The Reid interrogation techniques that prompted his false confession in 1955 are described in the Eighth Circuit decision holding Parker's confession to be involuntary, s*ee Parker*, 413 F.2d at 465, and discussed at length by the *Miranda* Court. 384 U.S. at 449–58, 86 S. Ct. at 1614–19, 16 L. Ed. 2d at 709–14. Jesse Pearson is no Darrel Parker, and Marie Mahler is no John Reid.

*Id.* (quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S. Ct. 457, 465, 133 L. Ed. 2d 383, 394 (1995)) (internal quotation marks omitted). Relevant factors for determining custody include: "the language used to summon the individual[;] the purpose, place and manner of the interrogation[;] the extent to which [he] is confronted with evidence of his guilt[;] and whether [he] is free to leave the place of questioning." *State v. Deases,* 518 N.W.2d 784, 789 (Iowa 1994). Our analysis begins with the scene of the confession—Trinity Cottage at Bremwood—and the players, the underage suspect and his social worker employed by the state. We will next review the players' lines and actions to see if this interview had the characteristics of a formal arrest to constitute a custodial interrogation for purposes of *Miranda.*

1. *The scene.* The Waterloo police had released Pearson from their custody, and Bremwood staff drove him from the police station back to the Bremwood campus in Waverly the afternoon of July 14. Bremwood was Pearson's place of residence. It is not a detention or lockdown facility. Rather, it provides a "home like" environment. Because he had run away and had charges pending, Pearson was moved into Trinity Cottage, an unlocked, windowless room where he could be closely observed by staff. Pearson argues he was not "free to leave," but "[i]ncarceration does not automatically render an inmate in custody for purposes of *Miranda.*" *Id.*; *see also Shatzer,* 559 U.S. at ___, 130 S. Ct. at 1224, 175 L. Ed. 2d at 1058 ("[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."). When an inmate is questioned, we look for "some added restriction on the inmate's freedom of movement stemming from the interrogation itself." *Deases,* 518 N.W.2d at 789. For example, in that case, an inmate who assaulted a guard was handcuffed and taken from his cell for

questioning in another area of the prison. *Id.* We found those facts showed "a restriction of Deases' freedom over and above that of his normal prison setting" sufficient to establish custody. *Id.* at 790. By contrast, Trinity Cottage was Pearson's new room at Bremwood where he slept the night of July 14. He was not handcuffed or summoned by Mahler for questioning in another room. Rather, she interviewed him in his room with the door open. The scene of their interview is not a factor tending to establish custody.

2. *The players.* Pearson was nearly seventeen and one-half years old by mid-July. Because he was a minor, we will begin with the age analysis mandated by *J.D.B.* The concern is that underage suspects may be more vulnerable than adults to the coercive pressure of a police interrogation. *J.D.B.,* 564 U.S. at ___, 131 S. Ct. at 2403, 180 L. Ed. 2d at 323 ("[A] reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go."). Our court anticipated *J.D.B.* by holding the age of juvenile defendants is to be considered in the custody status in *State v. Smith,* 546 N.W.2d 916, 923 (Iowa 1996) (police interviews of fifteen-year-olds voluntarily brought by mothers to juvenile center were not in custody for *Miranda* purposes). Subsequent cases, however, called into question whether age is a factor to consider. *See State v. Bogan,* 774 N.W.2d 676, 681 n.1 (Iowa 2009).

*J.D.B.* involved a thirteen-year-old seventh grader suspected of residential burglaries. 564 U.S. at ___, 131 S. Ct. at 2399, 180 L. Ed. 2d at 319. A uniformed police officer removed the boy from his social studies class and took him to a conference room at his middle school. *Id.* He was questioned for thirty to forty-five minutes behind closed doors with two uniformed officers, the school principal, and another

administrator present. *Id.* No *Miranda* warnings were given before the boy confessed to several thefts. *Id.* at ___, 131 S. Ct. at 2399–2400, 180 L. Ed. 2d at 319–20. The boy's resulting adjudication of delinquency was affirmed by a divided panel of the North Carolina Court of Appeals and by the North Carolina Supreme Court, with two dissents. *Id.* at ___, 131 S. Ct. at 2400, 180 L. Ed. 2d at 320–21. The state appellate courts declined " 'to extend the test for custody to include consideration of the age . . . of an individual subjected to questioning by police.' " *Id.* (quoting *In re J.D.B.*, 686 S.E.2d 135, 140 (N.C. 2009)). The United States Supreme Court reversed, holding that a suspect's age informs the *Miranda* custody analysis. The *J.D.B.* Court requires consideration of the suspect's age when it is known or objectively apparent to a reasonable officer at the time of questioning. *Id.* at ___, 131 S. Ct. at 2404, 180 L. Ed. 2d at 324–25.

The *J.D.B.* Court itself recognized age is an insignificant factor when the defendant is a teenager close to the age of majority. *Id.* at ___, 131 S. Ct. at 2406, 180 L. Ed. 2d at 326–27. Pearson was just seven months shy of his eighteenth birthday at the time of his confession. Every parent and adult who works with teenagers can appreciate the difference between a thirteen-year-old and a seventeen-year-old. We are not dealing with a frightened seventh grader accused of furtive thefts. Pearson brazenly beat an elderly man in the victim's own kitchen. He had a prior history of assaulting adults, including his mother and police. He had no difficulty invoking his *Miranda* rights at the Waterloo police station after his apprehension in this case. It is relevant, although not determinative, to the age/custody analysis that the district court denied Pearson's motion to transfer this case to juvenile court based in part on the court's determination that there were no "reasonable prospects for

rehabilitating the child if the juvenile court retain[ed] jurisdiction." Iowa Code § 232.45(6)(*c*). Sadly, we are dealing with a hardened seventeen-year-old. In *Smith*, we considered the fifteen-year-old juvenile defendant's "extensive prior experience with the system of law enforcement" when concluding their confessions were voluntary. 546 N.W.2d at 927 ("Although these defendants may lack the calculated judgment of an adult, they are not young minors, either mentally or legally."). The same is true with Pearson. His age does not support a finding of custody.

We next consider Mahler's status as a social worker. Pearson relies on *Deases*, where we recognized "the mere fact that the state official conducting the interrogation" is not a law enforcement officer "should not insulate the State from the requirements of *Miranda* where these safeguards would otherwise apply." *Deases*, 518 N.W.2d at 790 (holding *Miranda* applied to interrogation of inmate by prison guard). In *Deases*, we approvingly cited *State v. Helewa*, 537 A.2d 1328 (N.J. Super. Ct. App. Div. 1988), which we summarized as follows:

> In *Helewa*, a social services caseworker conducted a custodial interview of the defendant who was charged with sexually assaulting his daughters. The New Jersey Superior Court found that the caseworker was a "law enforcement officer" for the purposes of *Miranda*. The court focused its inquiry on the likelihood that the information elicited from questioning would be used against the defendant in criminal prosecutions.

*Deases*, 518 N.W.2d at 790 (citing *Helewa*, 537 A.2d at 1330–33). *Deases* and *Helewa*, however, both focused on the custodial nature of the interrogation, not the job status of the interrogator. The correctional officer interrogated Deases in prison after he was taken to a different cell in handcuffs. *Deases*, 518 N.W.2d at 789. The caseworker in *Hellewa* interrogated the defendant at the adult correction center—a jail—after he

was arrested by police. *Hellewa*, 537 A.2d at 1329. The New Jersey Supreme Court subsequently held that *Miranda* safeguards were inapplicable to a caseworker's at-home interview of a father suspected of child abuse in *State v. P.Z.*, 703 A.2d 901, 910 (N.J. 1997). The *P.Z.* court noted "the issue turns on [the defendant's] non-custodial status" and distinguished *Hellawa* on grounds that the defendant in that case was interviewed while incarcerated. *Id.*

Pearson's case is more like *State v. Trigon, Inc.*, in which we held that *Miranda* did not apply to an IOSHA inspector's office-interview of a corporation's president regarding a workplace fatality. 657 N.W.2d 441, 444 (Iowa 2003). We noted the IOSHA inspector was investigating "whether the fatality resulted from a lapse in safety procedures and devices that would put other employees at risk of injury unless abated." *Id.* The inspector "had no weapon, no badge, and no authority to arrest" and "was [not] mounting a criminal investigation." *Id.* The same is true for Mahler. She was not a law enforcement officer, parole officer, or probation officer.

Mahler's nearly eight-year history as Pearson's caseworker cuts against a finding of custody. *See Minnesota v. Murphy*, 465 U.S. 420, 433, 104 S. Ct. 1136, 1145, 79 L. Ed. 2d 409, 423 (1984). In *Murphy*, the United States Supreme Court concluded the circumstances of a probation interview by a familiar caseworker lacked the coercive pressures of a custodial interrogation by an unfamiliar police officer:

> [C]ustodial arrest thrusts an individual into "an unfamiliar atmosphere" or "an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner." Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment. Murphy's regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from

> psychological intimidation that might overbear his desire to claim the privilege.

*Id.* (quoting *Miranda*, 384 U.S. at 456–57, 86 S. Ct. at 1618–19, 16 L. Ed. 2d at 713–14) (footnote omitted).

Mahler and Officer Michael had different roles that did not intersect until days after Pearson's confession. Michael was the Waterloo police officer investigating criminal charges against Pearson in the Weiss incident. Mahler's purpose for interviewing Pearson was to perform a status assessment for his pending CINA and juvenile proceedings in Buchanan County. There is nothing in the record indicating Mahler was an agent for law enforcement. Michael did not ask Mahler to interview Pearson; they spoke for the first time days after Pearson's July 15 confession. She refused to give Michael her statement until authorized to do so by her DHS supervisor. *Compare State v. Bentley*, 739 N.W.2d 296, 299–300 (Iowa 2007) (child protection center counselor's "forensic interview" conducted with police officer observing and listening through "observation window" and collaborating with interviewer on follow-up questions to prove crime).

We therefore conclude Mahler was not an agent or stalking horse for the Waterloo police; she had her own reasons, as Pearson's caseworker, to interview him. "When a state-agency employee is working on a path parallel to, yet separate from, the police, *Miranda* warnings are not required." *Wilkerson v. State*, 173 S.W.3d 521, 529 (Tex. Crim. App. 2005) (holding defendant's confession to caseworker admissible despite lack of *Miranda* warnings when she was not acting in tandem with police officers). Mahler's status as a DHS caseworker operating independently from the Waterloo police reinforces our conclusion that her interview of Pearson was not a custodial interrogation.

3. *The players' lines and actions.* Mahler immediately confronted Pearson with evidence of his guilt. This factor supports a finding of a custodial interrogation. Her first words to him after he was awakened asked how he was doing, and when he said, "I'm okay," she said, "Did you actually do what everybody's saying you did?" He responded, "What did I do?" Mahler then asked, "Did you actually hit an old man?" Pearson's next line was his confession, "Yeah. So? I hit him over the head with a frying pan." Mahler's approach with Pearson is akin to the probation officer's interview in *Murphy* in which she directly confronted the defendant with evidence of his guilt and consciously sought incriminating statements. The United States Supreme Court concluded the interview was noncustodial, stating:

> Since Murphy was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.

*Murphy*, 465 U.S. at 433, 104 S. Ct. at 1145, 79 L. Ed. 2d at 423. Similarly, we conclude that Mahler did not convert her status assessment into a custodial interrogation by asking Pearson at the outset what he had done. Mahler did not wear him down through a lengthy interrogation; Pearson freely admitted what he did to the victim at the very outset of their discussions. Pearson knew the day before he could refuse to answer the questions of the Waterloo police; we see no reason he did not feel equally at liberty to decline to answer Mahler's questions.[3]

---

[3]Pearson does not claim any sort of patient-therapist privilege. Our law does not require social workers to withhold testimony regarding information revealing "the contemplation or commission of a crime." Iowa Code § 154C.5(1).

The district court correctly found that "[t]he record is devoid of any threats, deceit, or other improper promises which were made to Pearson prior to his making admissions" and that Pearson's statements "were made willingly and voluntarily." The court of appeals on its de novo review reached the same conclusion:

> Pearson was not summoned to speak to Mahler; she went to the cottage at Bremwood where he was staying to speak to him. The purpose, place, and manner of questioning were based on Mahler's position as the caseworker in Pearson's CINA case. Mahler testified she was worried Pearson might be asked to leave Bremwood and she would need to look for another placement for him. She was not acting as a representative of law enforcement officials. Pearson was not confronted with evidence of his guilt to any substantial degree—Mahler asked him whether he had done what people were saying he did, and then asked, "Did you actually hit an old man?" Finally, the evidence shows Pearson was free to leave the place of questioning. Mahler testified that as a CINA, Pearson could not be placed in a locked facility. The door to the room where Mahler questioned Pearson was open. Pearson could walk out of the room, although he had been placed in a room where staff would be sure to see him if he left the cottage.
>
> On our de novo review, we agree with the district court's conclusion Pearson was not in custody at the time he was questioned by Mahler. Pearson had not been formally arrested at that time, and his freedom of movement was not notably restricted. A reasonable person in Pearson's position would not believe he or she was in custody. Because Pearson was not in custody at the time he was questioned by Mahler, there was no need for a Miranda warning.

This case is lacking the "essential ingredients of a 'police-dominated atmosphere' and compulsion" that implicate the concerns underlying *Miranda*. *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 2397, 110 L. Ed. 2d 243, 251 (1990) (holding confession to undercover agent posing as cellmate did not implicate *Miranda*). Pearson was not handcuffed or physically restrained; the door to his room was left open. He confessed without any lengthy or aggressive or hostile questioning from Mahler, and the brevity of Mahler's interview preceding

his confession belies a finding of compulsion. *See Smith*, 546 N.W.2d at 924–25 (noting a "relaxed" style of questioning and that "[t]he interviews themselves were rather brief in duration, lasting only from twenty to forty minutes"). Mahler noted Pearson was "cocky" and remorseless, not intimidated or frightened.

Based on our own de novo review of the totality of the circumstances, we reach the same conclusion as the district court and court of appeals: Pearson objectively would not have felt he was under arrest or restrained to a degree associated with formal arrest when he confessed. Accordingly, we hold Mahler's July 15 interview was not a custodial interrogation for *Miranda* purposes and that Pearson's confession was voluntary and admissible.

**V. Disposition.**

We affirm the decision of the court of appeals and affirm Pearson's district court convictions and sentence for first-degree robbery and willful injury. We reverse the district court's conviction of Pearson for going armed and remand for a new trial on that charge using a corrected marshaling instruction that includes the element of "movement."

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

All justices concur except Mansfield and Zager, JJ., who take no part.